Madden, Judge,
delivered the opinion of the court:
On May 18,1929, plaintiff, a North Carolina corporation, entered into a contract with the defendant to furnish all labor and materials and perform all work required for the construction of the foundations of the several structures comprising the Bridge Plaza and the Watergate of the Arlington Memorial Bridge project, Washington, I). C., together with any additional work directed by the contracting officer, such additional work to be paid for at the unit prices specified in the contract.
*459 The work under the contract included furnishing all labor ¡and materials for clearing the site of the work of trees, •buildings, underground water pipes, conduits and other obstructions ; digging trenches along the parkway and at the site of the Watergate; digging and cribbing 82 pits or wells, into which reinforced concrete for cylinders and foundation piers was to be placed; constructing cofferdams around areas where work was to be carried on within or near the limits of the river bed, where seepage of water might be expected; building wooden forms for and casting and driving 576 reinforced concrete piles; driving several thousand feet of sheet piling, both wood and steel; and tearing out and reconstructing a large sewer which intersected the site of the work.
The contract price was $328,700, and the work was to be ■completed within 180 days after receipt of notice to proceed, which made the original completion date November 21,1929. The contract provided that liquidated damages in the amount of $100 per day might be assessed against plaintiff for lateness in completing the contract work. It also provided that the time for completion would be equitably extended on account, inter alia, of changes or additions directed by the contracting officer which delayed completion. On account of changes directed by the contracting officer during the course of the contract plaintiff received $70,192.28 additional compensation and 62 days’ additional time for performance. The work was completed June 21, 1930,. 212 days after the original completion date and 150 days after the completion date as extended.
Plaintiff sues for $133,000 under a special act of Congress approved May 6, 1937 (50 Stat. 955). That act reads as follows:
That the claim of Grier-Lowrance Construction Company, Incorporated, for losses and damages under contract numbered AMB 28, dated May 18, 1929, for the construction of the foundation for the several structures of the Arlington Memorial Bridge project be, and the same is hereby, referred to the United States Court of Claims with jurisdiction to hear the same to judgment, said claim to be adjudicated upon the basis of all losses or damages suffered by the said company duly found to *460 be due to acts of the Government or delays caused by the Government or subsurface conditions unknown to the contractor and not disclosed by the Government before contract was entered into, notwithstanding any lapse of time or any provisions of the statute of limitations: Provided, That suit hereunder is instituted within four months from the approval of this Act.
Plaintiff contends that the court’s function under this act is limited to the ascertainment of the amount of losses suffered by plainiff due to “acts of the Government or delays caused by the Government or sub-surface conditions unknown to the contractor and not disclosed by the Government before contract was entered into”, and that, this amount having been found, judgment for plaintiff should follow as a matter of course. This contention would seem to mean that Congress intended that it should be immaterial whether the “acts of the Government” or “delaj^s caused by the Government” were rightful or wrongful, and that the absence of disclosure by the Government of “sub-surface conditions unknown to the contractor” should be a ground of recovery even though the Government did not know and had no duty to know the conditions, and even though plaintiff could, by the exercise of prudence, have known them itself, or had, by the terms of the contract, assumed the risk of such variations in the conditions of the work as actually were encountered. We think that Congress had no intention to imposed upon us the duty to discard all legal and equitable bases of liability and merely trace the relation of cause and effect between rightful and proper conduct on the part of the Government, or risks contracted for by plaintiff and paid for by the Government and “losses” suffered by plaintiff as a consequence thereof. We think that Congress would hardly have described as “losses or damages suffered by the said company duly found to be due” to acts of the Government, the mere financial consequences to plaintiff of the Government doing what it had a right to do, or its insisting on plaintiff’s doing what it had contracted to do. In our consideration of the case, therefore, we shall examine into the consequences only of wrongful acts or nondisclosures of the Government, or breaches of contract on its part, or refusals to compensate plaintiff as provided in the contract.
*461 A question arises as to whether plaintiff’s failure to make timely written protests concerning the subjects of its claims, and its failure to appeal from adverse decisions of administrative officials, prevents our consideration of those claims on their merits, or whether the special jurisdictional act relieves plaintiff of these impediments. A consideration of the legislative history of the special act persuades us that Congress did not intend to give plaintiff any special relief in that direction. In view however, of what we say hereinafter about the contracting officer’s waiver of the lateness of plaintiff’s claims, and of the impracticability of any appeal in the peculiar circumstances of the case, the question becomes immaterial, and we do not discuss the legislative history.
Plaintiff claims that a considerable number of items of work which it did, and which, it alleges, it was required to do, were made necessary by some fault of the defendant, or by some unforeseen condition which developed on the job, or were, under the terms of the contract, such items as entitled plaintiff to greater compensation than plaintiff has been paid, or were wholly outside the requirements of the contract.
Paragraph 20 of the specifications was as follows:
Protects. — If the Contractor considers any work demanded of him to be outside the requirements of the contract, or considers any record or ruling of the Contracting Officer or of the inspectors to be unfair, he shall immediately ask for written instructions or decision, and, within ten days after receipt of the same, he shall file a written protest with the Contracting Officer, stating clearly the basis of his objections. Unless the Contractor files protest as thus provided, he will be considered to have accepted the record or ruling.
In no instance did plaintiff ask for a written instruction or decision, or file a written protest with the contracting officer within the specified ten days. However, the contracting officer disregarded this provision of the specifications just as completely as plaintiff did, by accepting plaintiff’s claims after the work was completed, and considering them on their merits. To be sure, in his communications to the Comptroller General, the contracting *462 officer mentioned that the plaintiff had not protested the various matters at the time they arose. He was, apparently, only citing this fact as evidence of lack of merit in the claim, and not as a bar to consideration of the claim. Besides, these communications to the Comptroller General were not made known to plaintiff, and so would not avoid the waiver which resulted from the contracting officer’s consideration of the claims on their merits.
When the contracting officer did decide the belated claims against plaintiff on their merits, plaintiff, according to the provisions of Article 15 of the contract, was to have had the right to appeal to the head of the department. But the contracting officer was the chief executive officer of the Memorial Bridge Commission which made the contract, so he was also, in effect, the head of the department. In the circumstances, no appeal was practicable. Besides, the contracting officer,' to some extent not clear from the record, abdicated his function of decision in favor of the Comptroller General, who was not, under the contract, given any power of decision.
In this state of confusion in the contract itself, and in the conduct of both parties, we shall' consider and decide the several items of plaintiff’s claim on their merits.
Items 1 and S. — Making and driving 16 extra concrete piles, main steps, and placing extra concrete in connection therewith.
Plaintiff claims $2,438.00 for making and driving 16 extra concrete piles, in addition to. the number called for by the contract, and $465.50 for placing extra concrete to enlarge the area of footings to include these piles. The piles called for by the contract were to be driven in groups of five, four of them making the corners of a square and the fifth in the center. A concrete footing was then to be poured which, would rest on these five piles, and a column, not included in plaintiff’s contract, was intended to be rested on each footing.. Plaintiff drove some of the piles in each group, in the instances in question, so that they were not in the position intended by the defendant. When this fact was discovered,, plaintiff was permitted to drive an extra pile in each such. *463 group so that the group of six piles could be covered by a concrete footing larger in area than that originally intended, on which larger footing the column could be properly centered. It was less expensive to plaintiff to use the 16 extra piles and the extra concrete required by the enlarged footings than it would have been to pull the piles that were out»of place and put them or others where they were intended to be.
Our question is whether the plaintiff or the defendant was responsible for the misplacing of the piles. We have found that the contract drawing wras ambiguous, and that plaintiff’s interpretation of it was not unreasonable. The drawing had a legend, “C L (meaning center line) of Footing”, with an arrow leading to a line running through the center of a square. It had another legend, “C L Column”, with two arrows leading to two lines near to and equidistant from the former line. What the legend and arrows were supposed to mean is not made clear in the evidence, but on the face of the drawing they are confusing. Plaintiff made a lay-out of where it proposed to drive the piles and presented it to the defendant’s representatives. They, to use the langauge of the contracting officer, “did not discover the mistake and did not disapprove the contractor’s lay-out as originally placed.” When, after the piles were driven, it was discovered that there was something wrong it took a long conference to figure out how the mistake had been made. That fact is evidence of confusion in the drawings.
The defendant urges, and we have found, that plaintiff’s superintendent admitted that it was plaintiff’s mistake and asked to be allowed to correct it in the most inexpensive way. That is strong evidence pointing to plaintiff’s responsibility, yet it does not persuade us. Since nothing occurred thereafter which would give rise to any estoppel against plaintiff because of ths admission of its superintendent, we conclude that plaintiff is entitled to be compensated for correcting a condition caused by the defendant’s mistake. We therefore give plaintiff a judgment for the cost of making and driving the extra piles, covered by Item 1 of its claim, and for placing the extra concrete, covered by Item 3.
*464 Item 8. — Extra concrete used in increasing depth of footings as a substitute for lengthening piles by splicing.
Plaintiff claims $2,257.20 for 118.8 cubic yards of concrete used in adding extra depth to footings under the main steps of the project, because the piles which it drove there were to® short to bring their tops up to the intended level of the bottoms of the footings. The level of the bedrock, some 50 feet below the surface of the site, was irregular. In casting concrete piles and selecting piles for estimated correct length for driving to bedrock in particular locations on the project, it was inevitable that some of them would not be the right length. If they were too long they would have to be cut off, which would involve work and waste. If they were too short they would have to be pulled out and replaced with longer ones, or spliced, which considering the splicing of the reinforcing steel in the piles, was difficult. Plaintiff proposed and the defendant assented to the proposal, that instead of pulling or splicing the short piles, deeper footings should be used. This took more concrete than the corresponding length of piles would have taken, but still was less expensive.
We think there was no duty on the defendant to pay for this extra concrete. The last paragraph of specification 34, set out in finding 14, is as follows:
The contractor shall, however, be solely and entirely responsible for the sufficient length of each individual pile; and he shall pull out and replace, or splice (if splicing be permitted for that case), any pile which after being driven is found to be too short to permit cutoff at the proper level and, in the case of concrete piles, the exposure of the required length of reinforcing-steel for dowels.
The third paragraph of specification 48, which is set out in finding 3, warned the contractor of abrupt variations of the level of bedrock under the area. In the face of these warnings, plaintiff, if it made a prudent bid, must have estimated for the additional expense whch would or might result from these variations, and that estimate must have been reflected in its bid. The Government has already paid plaintiff for this risk and should not have to pay again.
*465 Item, If.. — Jetting concrete cylinders in place.
Item, 5. — Straightening concrete piles.
Plaintiff poured certain concrete cylinders in the parkway underpass and drove certain concrete piles in the same area, which cylinders and piles became warped out of vertical position, and plaintiff was required to straighten them up. Plaintiff contends that the cause of the trouble was an unforeseen tendency of the subsurface earth to move, and faulty design of the project. We have found that plaintiff has not proved these contentions, and that the reason for Ihe cylinders and piles having moved out of alinement was plaintiff’s order of carrying on the work, in disregard of the advice of the defendant’s representatives, and plaintiff’s failure to back fill the caissons in which the piers were poured, which resulted in cave-ins and disturbances of the earth.
Item 6. — Hauling and dumping earth from foundation piers.
Plaintiff claims $3,765.88 for hauling away the material excavated from the cofferdams at the piers of the parkway approach. The contract set a price of 90 cents per cubic yard for digging and hauling away extra earth which might be ordered.
There was extra earth, for the digging of which plaintiff had been otherwise paid. The contracting officer determined that the price for hauling alone should be 40 cents, and we have found that that was a fair price. He also found by computations based on the dimensions of the cofferdams how much additional earth there should have been to be hauled awTay, if the proper and necessary amount of excavation had been done. These computations were reasonable, and plaintiff did not satisfactorily prove either the existence of or the necessity for the larger amount of yardage on which it bases its claim. Plaintiff may not recover on this item.
Item 7. — Additional length required to cast on piles above the lengths given in the specifications.
Because of the variation in the depth of bedrock over the area of the project, it was, as we have seen, impossible to fix in advance the exact length of each of the 576 concrete *466 piles which were to be driven. Section 33 of the specifications gave an assumed ■ average depth of bedrock for each of the several locations where groups of piles were to be driven, and provided that if the assumptions proved to be incorrect, and the aggregate footage of piles required should turn out to be more than the estimate, the contractor would be paid for the excess at the unit- rate per foot, but if - the aggregate should turn out to be less than the estimate, no deduction from the estimated amount would be made.
• Plaintiff, before casting its piles, presented to the defendant a statement showing the lengths in which it proposed to cast the several groups of piles, and asked for suggestions. The defendant’s representatives advised plaintiff that the responsibility for estimating the correct length of the piles was on plaintiff; that the way to be sure of the length of the piles would be to first excavate for the piers in the areas where the piles were to be driven, and in that way discover the actual depth of the bedrock; but that if this was not done it would be prudent, in view of the difficulties of splicing, piles if they proved to be too short, to cast the piles longer than the assumed depth of bedrock and cut off the excess, if any. Plaintiff followed- the advice to cast extra length on the piles and now claims that, under the contract, it is-entitled to be paid for-the excess cutoff at'the footage-rate provided in the contract, the amount of plaintiff’s claim in that regard being $5,643.. .
Section 34- of the specifications, which section related to “extra work”, provided, inter, alia—
As stated on the drawings, the elevations shown for .bedrock are average only, and departures of five feet or more either way from the depths shown may be expected due to local variations.
If, due to unexpected depths to bedrock encountered during the work, the aggregate footage of piling driven * * * shall amount to more than the quantities which would have resulted from the assumed average depths just stated, the Contractor will be paid for all excess over and above these quantities as follows: (Here amounts per foot for the several types and sizes of piles were given.)
*467 The same section of the specifications also provided:
The length of piles shall be considered as the net length in place after the cut-off, with no allowance made for extra length to expose dowel steel.
We think that the contracting officer’s consultation with and advice to plaintiff as to what would be economical practice in the casting of the piles did not affect the rights of the parties under the contract. We think that the last quoted paragraph of the specifications is plain to the effect that the footage to be measured in computing extra pay was the footage in the ground. We suppose that plaintiff, if it made a prudent estimate before it bid on the contract, must have included in that estimate the wastage wdiich would necessarily result .from the fact, made clear by the specifications, that the depth of bedrock varied. The fact that in another instance under the contract, in the case of an extreme variation from the estimated depth, the defendant, as plaintiff says, “after a long contest * * * finally paid plaintiff for the additional length of the 65 foot piles” does not show a contemporaneous construction of the contract such as to vary what it seems on its face to say.
Items 8 to 12. — These items, for which plaintiff claims $91,840.85, are, according to plaintiff’s allegations, based on increased expenses due to defaults of the defendant, causing delays in performance, and to difficulties and delays arising from excessive water encroaching upon the work and unstable subsurface soil conditions.
The first item in this group of claims is for 38 days’ delay from May 25 to July 2, 1929. Plaintiff claims that it lost this time because the site had not been cleared. But the evidence shows that the alleged obstructions on the site, other than those which plaintiff had contracted to remove, did not materially interfere with plaintiff’s progress, and that, in fact, plaintiff did not lose, the time, but made substantial progress during this period.
The next item is 17 days’ delay from July 2, 1929 to July 19, due to the Government’s delay in approving plaintiff’s time schedule. The defendant’s officials frankly conceded *468 that the schedule could have been approved by July 2, and, in the settlement of liquidated damages because of late completion, plaintiff was excused for these 17 days. Our question, however, is whether plaintiff was actually delayed for tire whole or any ascertainable part of the 17 days, so that consequential damages should be awarded it. According to the contract, plaintiff was not to begin work at all until its schedule had been presented and approved. It did begin work, however, on May 25, and after obtaining a postponement of its presentation of its schedule on account of its intended subcontracting of pile driving, it had to be reminded on June 13 that it had not presented the schedule. It still did not do so until June 29. We are not convinced that either plaintiff’s delay in presenting its schedule, or the defendant’s delay in approving it, actually prevented work from being done that would otherwise have been done. Plaintiff’s letter of September 20, 1929, hereinafter quoted, represents plaintiff’s own opinion of the cause of the lack of satisfactory progress up to and long beyond that time.
The next item in this group of claims is for $87,358.79, based on damages due.to unforeseen conditions and to the 55 days’ delay covered by the two preceding items, causing the operations of the contract to extend through winter months and also causing night work and general inefficiency, resulting in additional damages in the named sum.
We have already dealt with the question of whether the defendant caused plaintiff the 55 days’ delay which is asserted as a part of the cause of this item of damage. As to the alleged unforeseen conditions, we have found that their existence has not been proved. Section 48 of the specifications, quoted in finding 3, sets forth in detail and, as we have found, accurately, except in unimportant particulars of which the defendant was not aware, the conditions on the site with reference to the subsoil, and the surface of the bedrock. Sections 10, 46, and 49 of the specifications, quoted in findings 2 and 3, impose on plaintiff the duty of inspecting the site, of planning its own methods of doing the work, and of accomplishing the work for the contract price.
As to the alleged excess of water in the excavations, the *469 proof does not convince us that more water was encountered than was to be expected in work, much of which was to be carried down some forty feet to bedrock, along the bank of a tidal stream and in all kinds of weather. We have found that the old loose rock sea wall, which, plaintiff claims, acted as a duct to permit water to come into the project, did not have any substantial effect in that direction. The old cinder ballast of a temporary railroad track which had been abandoned many years before may have caused some difficulty in the driving of the few piles which passed through it, but it was, on the other hand, easier to excavate than the materials described in the specifications. It did not constitute an unforeseen subsurface condition unless that expression is to be made to apply to even slight and unimportant variations from just what is expected.
Plaintiff claims that there was, beginning some 12 feet below the surface of the ground, a “mud wave” or underground movement, which was entirely unlike anything plaintiff had ever encountered in similar work, the force of which was such that it swayed piles and concrete cylinders which extended some forty feet into the ground to bedrock. We have found that there was no such movement.
When plaintiff began its work, the Memorial Bridge, the east end of which adjoined plaintiff’s work, was being completed. There is no evidence that the contractors who built that bridge, and who excavated extensively in that adjacent ground, encountered any such movement. Plaintiff excavated numerous pits for cylinders and piers, and the sides of these pits stood up with no more cribbing than would have been expected in soil near to a tidal river. This would have been impossible if there had been any such underground movement as plaintiff claims.
On September 20, 1929, after plaintiff had been working on the project for four months of the six months within which the whole project was originally intended to be completed, plaintiff, in reply to a letter from the defendant complaining about the slowness of plaintiff’s progress, answered, in part as follows:
We did not answer your letter- of September 7th pending a more thorough investigation into our in *470 ability to comply with the amended schedule as agreed in your office some weeks ago. Mr. Sadler is quite conversant with the circumstances, and we have asked him to rearrange' the schedule to your satisfaction, which we take it' has been or is being done. The reinforcing steel has been no end of trouble to us and we think has caused, in so far as we are able to determine, all of our delays.
i]; ‡ ‡ ‡ $
We feel that we now have enough materials on the job to really prosecute the several undertakings with diligence and with profitable results, and believe that from now on we can in a measure reclaim the time lost.
By the time this letter was written, excavation for piers and cylinders had been going on for some three months, and the concrete had been poured in many of them. If the underground movement existed, it would have been causing daily trouble. Yet plaintiff, after taking two weeks to •investigate the cause of its lack of progress, wrote “The reinforcing steel has been no end of trouble to us, and we think has caused, in so far as we are able to determine, all pur troubles.” Our • conclusion is that plaintiff was not delayed by the Government in the performance of its contract and did not encounter, to any appreciable degree, subsurface conditions unknown to plaintiff and not disclosed by the Government. Plaintiff is not therefore, entitled to damages under these items of its claim.
. Item IS. — Bepairs to concrete piles charged to plaintiff by Comptroller General.
The facts relating to this item are recited in finding 21. The defendant deducted $2,842.50 from plaintiff’s contract price to reimburse itself for work done by another contractor to repair a defective condition for which, the defendant claims, plaintiff was responsible. To justify the defendant in making such a deduction, after it had accepted plaintiff’s work, we think the defendant had the burden of proving plaintiff’s responsibility for the defect, and. explaining why, when at least a part of the conditions later repaired by the other contractor must have been obvious, the defendant accepted plaintiff’s work as complete. As to the lack of alinement of the piles, we are left in doubt as to whether *471 they are supposed to have been driven in the wrong place, or to have leaned out of place after the work was accepted. As to the exposed reinforcing steel, that must have been apparent when plaintiff’s work was accepted. In this state of the record, we conclude that the deduction was not justified, and that plaintiff should) recover the amount deducted, which was $2,842.50.
Item 14. — Liquidated Damages.
Item IS. — Administrative and office overhead for 150 days.
These items are determined adversely to plaintiff by our determinations concerning prior items. We have concluded that plaintiff was not, beyond- the time allowed it, delayed in completing the work by any cause for which the defendant was responsible, or which was, under the contract, an excuse for late completion. The assessment of liquidated damages for late completion was, therefore, what plaintiff had agreed to, and the additional overhead for the period of delay was not the responsibility of the Government.
Plaintiff may recover $5,746.00. It is so ordered.
WhitaKee, Judge; LittletoN, Judge; and Whaley, Chief Justice, concur.
JONES, Judge, took no part in the decision of this case.